
07/31/2008

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| PETER ANDREW BROCK and | § | Case No. 06-41172 |
| CYNTHIA KAY BROCK, | § | (Chapter 7) |
| | § | |
| Debtors. | § | |
| _____ | § | |
| DT CREDIT CORPORATION f/k/a | § | |
| DRIVETIME CREDIT CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Proc. No. 06-4228 |
| | § | |
| PETER A. BROCK and | § | |
| CYNTHIA K. BROCK, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION**

This matter is before the Court following a trial on the complaint filed by DT Credit Corporation f/k/a Drivetime Credit Corporation ("DTCC") against Peter and Cynthia Brock (collectively, the "Debtors"). DTCC seeks to deny the Debtors' discharge based on 11 U.S.C. §§ 727(a)(3) and (7) or, alternatively, a judgment declaring the Debtors' obligations to DTCC to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) or (a)(4). The Court exercises its jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) as well as the standing order of reference in this district. This matter is a core proceeding in which this Court may enter a final order pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

**FINDINGS OF FACT**

DTCC is the servicing arm of DT Acceptance Corporation. DTCC services retail

installment contracts transferred to DT Acceptance Corporation from DriveTime Car Sales, Inc. ("DriveTime"). DTCC contracts with collection agencies for the collection of delinquent DriveTime accounts. In return for their efforts, DTCC pays the collection agencies a commission, which is usually a percentage of the total funds collected by the agency.

On or about December 4, 2002, DTCC contracted with BKB & Associates ("BKB") to perform collections for delinquent DriveTime accounts around the country. The Debtors were the principals, directors, officers and sole shareholders of BKB. Cynthia Brock was the President of BKB, and Peter Brock was the Vice President. The Debtors were closely involved in and managed all the business activities of BKB.

Pursuant to several successive written contracts between DTCC and BKB (collectively, the "Contract"), DTCC forwarded BKB the names, social security numbers, and last known contact information for the delinquent accounts on which BKB was hired to perform collection activities. Information was also given to BKB regarding each of the customers' debts, including the type of loan issued and the amount owed. BKB used a debt management database called "DebtMaster" to maintain the information related to DTCC's customer accounts. As collections were made on the accounts, BKB updated the information in its DebtMaster software program to reflect payments made and settlements reached.

The Contract required that BKB keep the sums collected on delinquent DriveTime accounts in a separate trust account for DTCC. At the end of each month, BKB was required to send DTCC payment for the entire month's collections on DTCC accounts as well as a "Trust Statement" detailing the collections made by BKB. Based on the lump-sum payment made to DTCC and the information contained in the Trust Statement, DTCC would then pay BKB a 40%

commission on the total amount collected. DTCC was BKB's largest client in terms of volume.

Unbeknownst to DTCC, BKB did not maintain a separate trust account for the sums it collected for DTCC. DTCC also did not know that BKB routinely withheld (and did not report to DTCC or post to DebtMaster) a portion of the collections received from DTCC's customer accounts in a given month. BKB began withholding an increasing amount of its collections for DTCC as BKB's business declined. Although at least some of the withheld funds were eventually reported and remitted to DTCC, other amounts were never reported or remitted. Mr. Brock testified at trial that the money BKB withheld from DTCC was used to fund BKB's operations.

Mr. Brock decided which payments to delay sending or reporting to DTCC. The only record of the withheld and unreported amounts was maintained by BKB's bookkeeper, Michelle Hartfield. Ms. Hartfield testified that her job included posting payments to DebtMaster and that she kept a paper record of the payments she was instructed not to post to DebtMaster.

In late June 2006, the Debtors learned that the Internal Revenue Service ("IRS") intended to levy BKB's bank accounts. The Debtors informed BKB's employees that BKB would cease operations on June 30, 2006. During the first few days of July 2006, the Debtors shredded many of BKB's records, which consisted in large part of personal information regarding the customers whose accounts BKB had been hired to collect. In addition, at some point, the paper record of amounts withheld from and unreported to DTCC was lost or destroyed.

BKB failed to provide DTCC with a timely trust statement for June 2006. DTCC used a "skip tracer" to locate Mr. Brock, who informed DTCC that the Debtors and BKB were filing for bankruptcy. Mr. Brock promised to submit a trust statement for June 2006 and, in fact, faxed a

trust statement to DTCC on July 14, 2006. According to the trust statement, which included only those amounts posted to DebtMaster, BKB's gross collections for June 2006 totaled $81,443.40. BKB's collection fees on this amount were $32,577.26, and BKB owed DTCC the remaining $48,866.14 pursuant to the parties' Contract. BKB has not paid DTCC any portion of the amounts that it has admitted collecting in the trust statement for June 2006.

In early July 2006, the IRS levied BKB's bank accounts and seized, among other things, $17,000 from BKB's account at First International Bank. At or around the same time, BKB transferred its furniture and equipment to another collection company, Bowen & Associates, Inc. ("Bowen"). Bowen was incorporated by Mrs. Brock's mother, Susan Bowen, in late June 2006. Bowen is solely owned by Mrs. Bowen and has employed the Debtors since shortly after its incorporation.

At some point after BKB ceased doing business but before its computers and furniture were transferred to Bowen, its computer server "crashed." A computer consultant was working on BKB's computer system at the time of the crash, and he transferred a copy of the hard drive for the server to one of BKB's computers. The computer was then sold to Bowen. However, Mrs. Brock testified, credibly, that the computer BKB sold to Bowen contained only an empty shell of the DebtMaster program.

After BKB ceased operating, DTCC began to receive calls from customers who had been making payments on accounts handled by BKB. Some of these callers inquired as to why payments had not been reflected on later statements they received and/or why a release had not been issued after the negotiated settlement payment was made in full to BKB. DTCC was receiving between two and five such calls a month at the time of trial. According to DTCC, the

calls they had received as of the time of trial showed that BKB had failed to forward DTCC approximately $50,221.41 in payments collected from DTCC's customers.

The Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code on July 28, 2006. BKB filed a separate Chapter 7 petition on the same date. In September 2006, the Chapter 7 trustee in BKB's bankruptcy case filed a motion requesting an order directing the IRS to turnover the funds it had seized from BKB's account at First International Bank. The Chapter 7 trustee alleged that the transfer of the funds in BKB's account at First International Bank to the IRS was avoidable under, *inter alia*, 11 U.S.C. §549. The Court granted the Chapter 7 trustee's motion, and the IRS voluntarily returned the funds to the Chapter 7 trustee.

In connection with BKB's bankruptcy case, the Debtors provided the Chapter 7 trustee with their prior year's tax return, some bank statements, and a computer. Mr. Brock informed the Chapter 7 trustee and his counsel that the computer contained the financial records and data of BKB as well as the information that had been posted to DebtMaster. Despite the Debtors' assurances and the passwords supplied by the Debtors, the Chapter 7 trustee was unable to locate any financial information on the computer or to access any information through DebtMaster. Based on the Court's observation of the witnesses, Mrs. Brock's testimony that the computer sold to Bowen contained only an empty shell of BKB's DebtMaster program, the acknowledged destruction of documents, the failure to produce the list of amounts withheld from and unreported to DTCC, as well as the fact that the bankruptcy trustee was subsequently unable to access any information from BKB's DebtMaster program, the Court finds that the Debtors, in fact, failed to provide the Chapter 7 trustee with detailed information regarding BKB's business.

DTCC initiated this adversary proceeding by filing its Complaint to Determine Dischargeability of a Debt and Objection to Discharge (the "Complaint") on October 20, 2006. In addition, in connection with BKB's bankruptcy case, DTCC alleged that the funds recovered by the Chapter 7 trustee from the IRS were held in trust for DTCC and were not the property of the bankruptcy estate. DTCC and the Chapter 7 trustee settled this dispute and, pursuant to an order entered in BKB's bankruptcy case on March 12, 2007, $8,500 of the amount recovered from the IRS went to BKB's bankruptcy estate and $8,500 was turned over to DTCC.

On November 16, 2006, DTCC filed an unsecured claim against the Debtors "in excess of $54,000" based on "services performed." The Debtors objected to the claim filed by DTCC and requested that their objection be tried with DTCC's Complaint. The Court tried the Debtors' claim objection as well as DTCC's Complaint on March 27, 2008 and, following trial, took the matter under advisement. After consideration, and for the reasons given below, the Court finds that the Debtors' discharge should be denied pursuant to § 727(a)(3) and (7).

## CONCLUSIONS OF LAW

### 11 U.S.C. §727(a)(3) and (a)(7)

Section 727(a)(7) extends the basis for denial of discharge to the debtor's misconduct in a substantially contemporaneous related bankruptcy case. In particular, §727(a)(7) provides that "the Court shall grant a debtor a discharge, unless -- . . . the debtor has committed any act specified in paragraph (2), (3), (4), (5) or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider." The term "insider" includes a "partnership in which the debtor is a general partner" and a "corporation of which the debtor is a

director, officer, or person in control." 11 U.S.C. §101(31)(A)(ii, iv).  Thus, if a debtor engages in objectionable conduct in a case involving a partnership in which the debtor is a partner or a corporation of which the debtor is an officer, director or controlling person, the debtor may be denied a discharge in the debtor's own case.  *See, e.g., In re Powell*, 88 B.R. 114 (Bankr. W.D. Tex. 1988) (company engaged in jewelry business was "insider" of Chapter 7 debtor husband, who was 90% owner of company and company's officer, operator, and prime employee, and thus, failure of company to account for deterioration of its inventory or preserve its records so that determination could be made was ultimately responsibility of debtor, thus warranting denial of debtor's discharge); *Tucker v. Devine* (*In re Devine)*, 11 B.R. 487 (Bankr. D. Mass. 1981) (debtor who was an insider of a corporation that had also filed a petition was denied a discharge when the debtor failed to produce books and records for the corporation).

Here, there is no disputed that the Debtors were "insiders" of BKB.  DTCC alleges that the Debtors destroyed or failed to keep books and records from which BKB's financial condition might be ascertained and, therefore, that their discharge should be denied pursuant to §727(a)(3) and (7).  Section 727(a)(3) provides:

> The court shall grant the debtor a discharge, unless ... the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).  Section 727(a)(3) is distinct from other subsections of §727, including (a)(2) and (a)(4), both of which specifically require a showing of intent or that the act was knowing and fraudulent.  The unambiguous language of §727(a)(3) requires no showing of knowing or fraudulent intent regarding the destruction of books and records.

7

As noted in *In re Chachra,* 138 B.R. 397, 401 (Bankr. S.D. N.Y. 1992), the debtor has the initial obligation to produce all records from which his or her financial condition might be ascertained. *See* 11 U.S.C. §521(a). Federal Rule of Bankruptcy Procedure 4005, which places upon an objecting creditor the burden of proving an objection to discharge under §727(a), "does not change the initial burden which is placed upon the debtor of producing records from which his financial condition may be ascertained." *In re Delancey,* 58 B.R. 762, 767 (Bankr. S.D. N.Y. 1986); *see also In re Switzer,* 55 B.R. 991, 996 (Bankr. S.D. N.Y. 1986) (same). *See also, e.g., In re Craig,* 252 B.R. 822, 828 (Bankr. S.D. Fla. 2000) (holding that failure to produce any relevant financial information in response to discovery requests was sufficient to bar discharge). The party objecting to a debtor's discharge bears the burden to prove that the debtor failed to keep and preserve his financial records and that this failure prevented the party from ascertaining the debtor's financial condition. *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003). If this burden is satisfied, the burden shifts to the debtor to prove that the inadequacy is justified under all the circumstances of the case. *Id.*

Here, the Debtors falsified BKB's business records by purposely failing to enter collection information into the DebtMaster program. The Debtors admitted to the destruction of BKB's records, and the paper record of amounts not posted to DebtMaster has been lost or destroyed. DTCC established that the Debtors failed to provide the Chapter 7 trustee with detailed information regarding BKB's business, including the information posted to DebtMaster. Without the information BKB entered into the DebtMaster program and the list of amounts that were not entered into the DebtMaster program, the Chapter 7 trustee, creditors, and the Court are unable to determine whether any funds held by BKB when it filed for bankruptcy actually

belonged to DTCC or the extent of DTCC claims against BKB or the Debtors. Thus, unless the Debtors justify their failure to keep BKB's records, a discharge should not be granted. *See, e.g., In re McNamara,* 89 B.R. 648, 653 (Bankr. N.D. Ohio 1988) (debtor's concealment of assets and failure to explain loss of assets warranted denial of discharge); *In re Grisham*, 245 B.R. 65, 75 (Bankr. N.D. Tex. 2000) (debtor-partners' failure to explain the loss or deficiency in bank's collateral represented by the unaccounted-for sale proceeds justified denial of their discharge). The Debtors, however, offered no such justification for their failure to report all collections made by BKB on DTCC's customer accounts or for their destruction of any records relating to amounts withheld from DTCC.

With respect to their failure to provide the Chapter 7 trustee with the information contained in BKB's DebtMaster program, Mr. Brock insisted in his testimony the collection information was, in fact, located on the computer he provided to the Chapter 7 trustee. However, having considered the all of evidence presented at trial, including the credible testimony of Mrs. Brock regarding the lack of any financial information on the computer sold to Bowen, the Court finds that the Debtors failed to provide the Chapter 7 trustee with complete and accurate information concerning the status of the BKB's affairs and financial history. Even if the Debtors had provided the Chapter 7 trustee with the information maintained by BKB in its DebtMaster program, this information would have been false and incomplete, because the Debtors purposefully did not post certain amounts collected for DTCC. As for whether the Debtors concealed recorded information or merely failed to keep or preserve the same, the Court need not concern itself. *See, e.g. In re Nazarian,* 18 B.R. 143, 149 (Bankr. Md. 1982) (court unable to ascertain whether debtor concealed, destroyed, or failed to keep adequate records, but his failure

9

to provide documentation sufficed for denial of discharge under §727(a)(3)). The Court concludes that, because the Debtors committed these acts in connection with the bankruptcy of an "insider," they should be denied a discharge in their own bankruptcy. *See* 11 U.S.C. §727(a)(3) and (a)(7).

Having found that the Debtors' discharge in bankruptcy should be denied pursuant to §727(a)(3) and (a)(7), it is not necessary for the Court to discuss DTCC's objections to the discharge of the Debtors' obligation to it. The Court will nonetheless address the Debtors' objection to DTCC's proof of claim as well as DTCC's objections to the dischargeability of its claim against the Debtors in order to provide the parties with a full discussion of the issues presented at trial.

### **Debtors' Objection to DTCC's Claim**

A proof of claim, if it is executed and filed in accordance with the Federal Rules of Bankruptcy Procedure, constitutes *prima facie* evidence of the validity and amount of that claim and is deemed allowed unless a party in interest objects. *See* 11 U.S.C. §502(a); FED. R. BANKR. P. 3001(f). A proof of claim, however, does not qualify for *prima facie* evidentiary effect if it is not executed and filed in accordance with the Federal Rules of Bankruptcy Procedure. *See First Nat'l Bank of Fayetteville v. Circle J. Dairy (In re Circle J Dairy, Inc.)*, 112 B.R. 297, 300 (W.D. Ark. 1989). Federal Rule of Bankruptcy Procedure 3001 generally sets forth the requirements for filing a proof of claim, and one of those requirements states that:

> when a claim . . . is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

FED. R. BANKR. P. 3001(c). Likewise, if a creditor claims a security interest in property of the debtor, Federal Rule of Bankruptcy Procedure 3001(d) requires the creditor to accompany his proof of claim with evidence that the creditor perfected a security interest.

Hence, the burden of persuasion under the bankruptcy claims procedure always lies with the claimant, who must comply with Federal Rule of Bankruptcy Procedure 3001 by alleging facts in the proof of claim that are sufficient to support the claim. If the claimant satisfies these requirements, the burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. *See Lundell v. Anchor Const. Specialists, Inc. (In re Lundell)*, 223 F.3d 1035, 1041 (9th Cir. 2000); *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (B.A.P. 2nd Cir. 2000). This can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, *see In re Lenz*, 110 B.R. 523, 525 (D. Colo. 1990), or by the presentation of legal arguments based upon the contents of the claim and its supporting documents, *see In re Circle J Dairy*, 112 B.R. at 300. If the objecting party meets these evidentiary requirements, then the burden of going forward with the evidence shifts back to the claimant to sustain its ultimate burden of persuasion to establish the validity and amount of the claim by a preponderance of the evidence. *See In re Consumers Realty & Dev. Co.*, 238 B.R. 418 (B.A.P. 8th Cir. 1999); *In re Alleghany Int'l, Inc.*, 954 F.2d 167, 173-74 (3rd Cir. 1992).

In this case, DTCC filed its claim in compliance with the Federal Rules of Bankruptcy Procedure, including the attachment of a copy of the agreement upon which its claim is based. Its claim is, therefore, *prima facie* valid. To rebut that effect, the Debtors essentially allege that

DTCC failed to precisely or clearly calculate the amount of its claim. As previously discussed, however, the Debtors provided inaccurate and incomplete information to DTCC prior to BKB's bankruptcy and the initiation of this adversary proceeding. Moreover, the evidence presented by DTCC at trial established that BKB failed to pay it 60% of the $81,443.40 collected in June 2006 and that BKB failed to pay it 60% of the $50,221.41 in unreported collections. After reducing this amount by the $8,500 DTCC received through its settlement with the Chapter 7 trustee in BKB's case, the Court finds that DTCC has established an unsecured claim against the Debtors in the amount of $70,498.89.

## **11 U.S.C. §523(a)(4)**[1]

The Bankruptcy Code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." 11 U.S.C. § 523(a)(4). This exception "was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (Matter of Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) (quoting *In re Boyle*, 819 F.2d 583, 588 (5th Cir. 1987)). Such a determination requires a plaintiff to demonstrate by a preponderance of the evidence that the referenced debt arose from improper acts taken by the debtor in the capacity required by the relevant statute or, alternatively, that the debtor possessed the requisite mental state required for recovery under the statute.

---

[1] In its trial brief, DTCC alleged claims under both §523(a)(2)(A) and (a)(4). With respect to its §523(a)(2)(A) claim, DTCC argued that the Debtors obligations to it should not be discharged because the Debtors falsely represented to its customers that they were representing DTCC after the Contract had terminated and then concealed payments they received from these customers. DTCC did not press these allegations at trial, and these allegations are not supported by the trial record. The Court, therefore, limits its discussion to §523(a)(4) of the Bankruptcy Code.

The nature of the fiduciary relationship required to trigger liability for fraud or defalcation under §523(a)(4) is determined by federal law. The Fifth Circuit construes the term "fiduciary capacity" more narrowly for purposes of §523(a)(4) than it does in other circumstances. *See Texas Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998). The Fifth Circuit has described the concept of a fiduciary under §523(a)(4) in the following terms:

> [Under §523(a)(4), "fiduciary" is limited to instances involving express or technical trusts. The purported trustee's duties must, therefore, arise independent of any contractual obligation. The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong. Constructive trusts or trusts *ex malificio* thus also fall short of the requirements of §523(a)(4).
>
> Statutory trusts, by contrast, can satisfy the dictates of §523(a)(4). It is not enough, however, that a statute purports to create a trust: A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary." Rather, to meet the requirements of §523(a)(4), a statutory trust must (1) include a definable *res* and (2) impose "trust-like" duties.

*Id.* 342 – 43. Thus, the requisite fiduciary relationship must exist under relevant law prior to the creation of, and without reference to, the indebtedness in question. *See Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir. 1980).

Under Texas law, an express trust "is created 'only if the settlor manifests an intention to create a trust.'" *Chapman Children's Trust v. Porter & Hedges, LLP,* 32 S.W.3d 429, 438 (Tex. App. – Houston [14th Dist.] 2000) (quoting TEX. PROP.CODE ANN. § 112.002 (Vernon 1995)). Absent ambiguity, this intent is discerned "from the language used in the written declaration or trust instrument." *City of Mesquite v. Malouf,* 553 S.W.2d 639, 643 (Tex. Civ. App. - Texarkana 1977). When interpreting a written agreement, Texas law requires courts to "examine and

consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex. 2003) (citing *Univ. C. I. T. Credit Corp. v. Daniel,* 243 S.W.2d 154, 158 (Tex. 1951)). "No single provision taken alone will be given controlling effect; rather all the provisions must be considered with reference to the whole instrument." *Id.* (citing *Myers v. Gulf Coast Minerals Mgmt. Corp.,* 361 S.W.2d 193, 196 (Tex. 1962)).

"Fraud" for purposes of §523(a)(4) has generally been interpreted as it is under §523(a)(2)(A), which requires a showing of intentional deceit. *See, e.g., In re McDaniel,* 181 B.R. 883, 887 (Bankr. S.D. Tex. 1994); *In re Wells*, 368 B.R. 506, 514 (Bankr. M.D. La. 2006). "Defalcation" is a willful neglect of duty, and willful neglect by a person owing a fiduciary duty is evaluated by a "recklessness standard." *See Office of Thrift Supervision v. Felt (In re Felt),* 255 F.3d 220, 226 (5th Cir. 2001). Because willfulness is evaluated objectively, it "charges the debtor with knowledge of the law without regard to an analysis of his actual intent or motive." *Id.* at 226 (citations omitted). Thus, the fiduciary is "presumed to know his legal obligations." *Id.* at 227.

Here, the Contract provided that BKB would collect certain of DTCC's customer accounts for DTCC. The Contract provided in pertinent part that BKB would "deposit all sums collected in a bank account that is designated as a trust account" and that "[t]he deposited sums are the property of [DTCC] and are not available for use by [BKB]." Construing this Contract under Texas law, the Court finds that the Contract created an express trust. The Court further finds that the Contract gave rise to the type of fiduciary relationship required under §523(a)(4) of the Bankruptcy Code. *See Barclays Am./Bus. Credit, Inc. v. Long (In re Long),* 774 F.2d 875,

878-79 (8th Cir. 1985) ("It is the substance of a transaction, rather than the labels assigned by the parties, which determines whether there is a fiduciary relationship for bankruptcy purposes." (citing *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333 (1934)). The Debtors defalcated, or willfully neglected their duty to DTCC, by failing report all of BKB's collections on DTCC's customer accounts and by using DTCC's funds to cover BKB's operating expenses. *See In re Felt*, 255 F.3d at 226 (discussing defalcation under §523(a)(4)). *See also Light v. Wilson,* 663 S.W.2d 813, 815 (Tex.1983) (with respect to corporate officers, "[t]he rule in Texas has always been that an agent is personally liable for his own torts."); *Leitch v. Hornsby,* 935 S.W.2d 114 (Tex.1996) (under Texas law, a corporate officer or agent can be liable for his or her own negligence). Moreover, the Debtors acted fraudulently by intentionally deceiving DTCC regarding the amounts collected by BKB pursuant to the parties' Contract.

## CONCLUSION

For the foregoing reasons, the Court finds that the Debtors' discharge should be denied pursuant to §727(a)(3) and (a)(7). The Court will enter a separate Judgment consistent with this Memorandum Opinion.

Signed on 7/31/2008

_Brenda T. Rhoades_  MD
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

15